Mary Grace Howey v. Commissioner.
Howey v. Commissioner
Docket No. 39712.
United States Tax Court
T.C. Memo 1954-19; 1954 Tax Ct. Memo LEXIS 220; 13 T.C.M. (CCH) 399; T.C.M. (RIA) 54125; April 30, 1954, Filed Robert Ash, Esq., and Carl F. Bauersfeld, Esq., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income tax against petitioner as follows: Year
Deficiency
1947
$14,475.79
1948
10,137.11 At the trial, petitioner moved for summary judgment on the pleadings as to the year 1947 upon the ground that the statute of limitations had expired. That motion was taken under advisement. Two questions are presented for our decision: 1. Did petitioner, who is on the cash basis of accounting, receive taxable income upon the receipt of certain "retain" certificates which were issued to her by a cooperative association? *221 2. Is the 3 or 5-year statute of limitations applicable to the year 1947? Findings of Fact Some of the facts were stipulated and they are hereby found. Petitioner is an individual who resides at Howey-in-the-Hills, Florida. She filed her Federal income tax returns for the years 1947 and 1948 with the collector of internal revenue for the district of Florida. She kept her books on a cash receipts and disbursements basis and reported her income for 1947 and 1948 on a cash and calendar year basis. Petitioner has been a citrus fruit grower for many years and now owns about 585 acres of citrus groves. During 1947 and 1948 she was a grower-member of the Plymouth Citrus Growers Association, a cooperative marketing association, hereinafter sometimes called "Plymouth," which was organized in 1909 under the laws of Florida and had its principal place of business at Plymouth, Florida. On October 12, 1935, respondent ruled that Plymouth was exempt from Federal income tax under section 101(12) of the Revenue Act of 1934. By letter dated February 4, 1946, this ruling was reaffirmed. Plymouth filed annual information returns as a tax-exempt cooperative and paid no tax with these returns. *222 Plymouth Citrus Growers Association is a nonprofit corporation without capital stock. During 1947 and 1948, it had approximately 250 members, who owned approximately 6,000 acres of land and contributed annually about two and one-half million boxes of citrus fruit. The association made available facilities for cultivating, harvesting, processing, and marketing the fruit of its members. Its activities included spraying, fertilizing, and cultivating the members' groves and picking, grading, sizing, processing, freezing, canning and marketing the fruit produced from such groves. It operated a cannery, a packing house and a fertilizer plant. It was a member of the Florida Citrus Exchange, an organization which markets the fruit of several cooperatives. For marketing purposes Plymouth assigned its members' fruit to pools according to the type and variety of fruit, and the members shared in the proceeds of each pool in proportion to the quantity of fruit they furnished. Plymouth's management determined whether the fruit would be processed through the cannery or sold as fresh fruit. Plymouth remitted the proceeds to its members after first deducting the estimated cost of handling, processing *223 and marketing. Plymouth treated its fertilizer plant and grove caretaking service as a single activity. It purchased the necessary ingredients and mixed the fertilizer according to the formulae that its production manager determined a particular grower needed. The grove caretaking service included purchasing trees from the nursery, planting such trees, irrigation of the groves, application of insecticides and fertilizer, cultivation and pruning of the trees, and other operations necessary to the proper planting and care of citrus groves. Each member was billed for the cost of fertilizer and insecticides used and of the grove caretaking service. The members paid such charges either in cash or through deductions taken from the proceeds of sale of their fruit. Petitioner purchased fertilizer through Plymouth and utilized its grove caretaking service to some extent. There was no written contract between petitioner and Plymouth in this regard. The only written contract between them was that which related to the harvesting, processing and marketing of fruit. During the years 1947 and 1948 petitioner marketed her citrus fruit through Plymouth in accordance with a members crop agreement *224 executed June 14, 1944, which read in part as follows: "MEMBERS CROP AGREEMENT "THIS AGREEMENT, made and executed in triplicate this 14th day of June, 1944, between Plymouth Citrus Growers Association, a corporation under the laws of Florida, with principal place of business at Plymouth, Florida, party of the first part, hereinafter referred to as ASSOCIATION, and Mrs. Mary Grace Howey of Howey, Florida, citrus grower, party of the second part, hereinafter referred to as GROWER, Witnesseth: "WHEREAS, when this agreement is properly executed by both parties GROWER becomes a member (if not already a member) of ASSOCIATION, and has all the rights and privileges granted by the charter and by-laws of ASSOCIATION to its members, and assumes his proportionate obligations and responsibilities in the affairs and operation of the ASSOCIATION; and "WHEREAS, GROWER is in accord with ASSOCIATION'S methods of operation and desires to take advantage of the benefits of cooperative marketing, and in so doing desires to assure to ASSOCIATION the absolute right to handle, sell and market for GROWER all citrus crops produced or controlled by GROWER on property or properties hereinafter decribed; *225 "NOW, THEREFORE, in consideration of the sum of One Dollar, paid to GROWER by ASSOCIATION, receipt whereof is acknowledged, and in further consideration of the expenses incurred by ASSOCIATION and agencies by it utilized in providing means and facilities for the handling and disposition of said fruit, it is hereby agreed as follows: "1. The GROWER hereby gives and grants unto ASSOCIATION the exclusive right and authority to pick, haul, handle, grade, wash, size, process, can, pack, ship, sell, and market in accordance with the rules and regulations of ASSOCIATION now or hereafter adopted or observed by it, all the citrus fruits and the products thereof grown or controlled by GROWER on approximately - acres described as follows: * * *
"It is understood that in addition to the other legal rights and remedies of the ASSOCIATION to enforce this agreement, a breach of the foregoing rights, or any of them, by GROWER, shall result in liability of GROWER to ASSOCIATION for liquidated damages in accordance with the by-laws of ASSOCIATION. This agreement, however, contemplates the privilege of ASSOCIATION to handle and market said fruit. * * *
"3. The by-laws of the ASSOCIATION, *226 now in existence, and all amendments thereto that may at any time be adopted, and the contract between ASSOCIATION and the Citrus Sub-Exchange of which it is a member, and the contract between such Citrus Sub-Exchange and the Florida Citrus Exchange, shall be parts of this agreement and shall be binding upon the parties hereto. "4. That said ASSOCIATION agrees to act as agent for GROWER under the terms of this agreement and to remit promptly all money that may be due GROWER from the sale of his, her or its fruit or from proceeds of any pool after deducting the amounts assessed by the Board of Directors pursuant to the by-laws of ASSOCIATION, including all assessments made by such Citrus Sub-Exchange and said Florida Citrus Exchange." * * *
Plymouth's articles of incorporation provide in part as follows: "ARTICLE 2. "That this Association is organized under the laws of this State as a Horticultural Association, and entitled to all the rights and privileges conferred by the laws of this State on similar corporations, and the voting power and all other rights and privileges of each of the members of this Association, holding a certificate of membership in the same, shall *227 be equal. "ARTICLE 3. "That there shall be no capital stock of said Association, but the same shall be organized as a Horticultural association and corporation, not for profit, and it shall not issue any shares of stock whatever, and shall not at any time declare or pay any dividend, or other profits on any holding in said corporation, but all moneys coming into this Association, for services rendered, or otherwise, shall be used by it for paying the expense of, and otherwise maintaining this Association, and any surplus thereof remaining in its hands, shall be used as the Board of Directors of this Association shall deem to the best interest of the Association, and said Association shall issue to each person who shall become a member thereof, a certificate of membership, and shall receive in return therefor the sum of One Dollar ($1.00), to be converted into the Treasury of said corporation; but no person shall at any time have, own or control more than one certificate of membership in said Association, nor shall any person not a grower of citrus fruit become or remain a member of this Association. * * *
"ARTICLE 8. "That each and every member of this Association shall *228 place the packing and handling of all citrus fruit, and such other produce as may be handled by this Association, and grown or controlled by him, her or them, into this Association, and that this Association shall charge for the packing and handling of such fruit and produce, such reasonable compensation as the Board of Directors of this Association shall fix and determine. * * *
"ARTICLE 10. "That the officers of said Association who shall transact its business, shall be a Board of Directors, a President and a Vice President, and said President and Vice President, shall also be the President and Vice President, respectively, of said Board of Directors, and each of them shall, at the time of filling said office, be a member of this Association, and a director in the same. * * * "ARTICLE 11. "That the Directors of this Association shall have the right and power to charge and collect from its members, and other fruit, vegetable and produce growers, represented or served by this Association, such compensation and remuneration, to be paid to said Association, as said Directors may fix and charge for its services to him, her, or them, in the picking, packing, handling, marketing, *229 shipping, and selling of any and all of the produce, and material, which this Association is herein authorized to handle and market." The bylaws of Plymouth read in part as follows: "Article III - Duties of Directors "The Board of Directors shall have general management of the affairs of the corporation, authorize all expenditures, make all contracts, and constitute the governing power of the corporation in all matters of business. They shall elect a manager and such other employees as they deem necessary to the proper carrying on of the business of the corporation, shall fix their salaries and define their duties. "The Directors shall have the right to borrow money or make loans, or to incur such indebtedness from time to time, pledging the credit of the Association, as the Directors may deem necessary to conduct the business of the Association. "The Board of Directors may enter into such business relations with Orange County Citrus Sub-Exchange or other organizations forming a part of the Florida Citrus Exchange for the marketing of fruit and such other matters as they deem necessary to best promote the interests of this corporation, and may adopt such rules and regulations *230 with reference to the officers and members of this corporation in the handling and marketing of their fruit as they shall deem best to promote the objects for which this corporation is created. * * *
"Article IV - Books and Accounts "The Directors shall cause proper books to be kept showing the amount of fruit of each member, and the variety and grade thereof. The books and correspondence of the corporation shall be in the name of the corporation, and each member shall have access to said books on any business day during ordinary business hours. A suitable office shall be maintained at the packinghouse, which shall be the office and headquarters of the corporation. "Article V - Membership "Any bona fide grower of citrus fruits may become a member of this Association when elected to membership by the Board of Directors, at any regular or special meeting. "All growers of citrus fruits, upon being elected to membership, shall continue to be and remain members thereof, subject to the privilege of withdrawal, as provided for in Article 7 of these By-Laws, and subject to expulsion, as provided in Article 16 hereof; but any member who sells all his Citrus Groves, and ceases *231 to be a grower of citrus fruits shall thereby automatically lose his membership, and cease to be a member of the Association. "The Directors may, at their discretion, require a fee to be paid by all new members. "Article VI - Duties of Members "It shall be the duty of all members of this corporation, and they hereby agree, to sell and market their citrus fruit through the agency of, or by means provided and directed or by the agency or agencies selected and employed, by this corporation. "In case any member of this corporation does otherwise sell, market or consign his said citrus fruits, he shall immediately pay to the Treasurer of this corporation the sum of fifty cents for each and every standard packed box so sold, marketed or consigned, as liquidated damages; it being impractical and extremely difficult to fix the actual damages suffered by this corporation. In default of such payment, the same may be recovered by action in any court having jurisdiction in the name of the corporation as plaintiff. "Every member selling or shipping fruit through or by the means established or authorized by this corporation, shall pay such an amount of money per box as may be found necessary *232 to create such a revenue as will defray all expenses necessary incurred in the conduct of the business of the corporation, and all the assessments made by the Sub-Exchange, together with the assessments made by the Florida Citrus Exchange. * * *
"Article VII - Withdrawals "Any member may withdraw his membership by filing a notice in writing with the Secretary of the Association at any time within ten days next before the annual meeting of the Association in any year, but such withdrawal of membership shall not release such member from the obligation contained in these By-Laws to ship through this Association any fruit which is matured at the time of said withdrawal; but such matured fruit, whether picked or not, shall be subject to the terms and conditions of these By-Laws in regard thereto, notwithstanding such withdrawal. "No member shall be permitted to withdraw who shall be indebted in any manner to or on account of this Association, or have any of its property in his possession, until such indebtedness shall have been fully paid, or such property restored to the Corporation. "Article VIII - Grading and Making Payments "Picking orders shall be given out pro rata *233 as nearly as possible. Each variety of fruit shall be graded according to sizes and quality, and each member shall receive credit for the number of pounds or boxes delivered of each grade that may be established, and receive pay for the same on the basis of what all fruit of similar grade has been sold for, in the particular pool in which his fruit was delivered, less expenses. * * *
"Article XI - Pools "The Board of Directors shall have authority to determine into what pools deliveries of fruit shall be divided, both of oranges and grapefruit. Members may express their preference at the annual meeting and the Directors will be guided thereby, but may change same when in their judgment it becomes advisable for the best interests of the corporation. "Article XII "No fruit shall be marketed by this corporation that does not come through the ordinary channels of membership, and any member shall be allowed to purchase fruit and market it through this corporation. * * *
"Article XVIII "Any member of this Association, having withdrawn or having been expelled from this Association by the Board of Directors, or its members, in accordance with Article XVI, or Article XVII, *234 shall thereupon forfeit all his rights, privileges and interest in said Association and in the property and assets thereof. * * *
"Article XX "This Association shall have the right, power and authority to borrow money for any purpose on the security of the products delivered to the Association and/or the products derived therefrom and/or any evidence of such products or by-products or cash or accounts arising from the sale thereof, and to give a lien either legal or equitable thereon as the owner thereof, and shall exercise all rights of ownership without limitation." * * *
During the years 1947 and 1948, Plymouth Citrus Growers Association paid to petitioner the proceeds from the marketing of her fruit in cash less the actual cost of marketing her fruit and less an amount retained by it as a reserve for operating capital. Plymouth issued to her certain Certificates of Equity in Growers' Surplus, commonly referred to as "retain" certificates for the amount it retained as a reserve for operating capital. There were separate reserves and certificates for the packing house, the cannery, and the fertilizer or grove caretaking activitiy. The certificates specified in dollars *235 and cents the "equitable interest" of the various members in the amount added to the reserve from operations of a particular year. There were no due dates on the certificates, they did not bear interest, and they were not transferable except in the discretion of Plymouth's directors. Some of Plymouth's "retain" certificates have been reissued to new certificate holders, but it has been the policy of Plymouth's directors to approve such action only when the previous owner had died or when joint owners asked to have their interests split. There have been no transfers on the books of Plymouth Citrus Growers Association of "retain" certificates within the past 10 years as the result of sales. From time to time Plymouth's directors authorized the redemption in cash of "retain" certificates applicable to particular crop years. Some certificates applicable to crop years preceding 1942 were redeemed during 1947 and 1948. On December 15, 1947, Plymouth issued to petitioner three Certificates of Equity in Growers' Surplus designated and showing a face amount as follows: Certificate
Face
No.
Designation
Amount
199
Cannery Operations
$ 7,603.03
261
Packing House Operations
9,349.41
269
Fertilizer Plant Operations
7,295.08
Total
$24,247.52
*236 On November 30, 1948, Plymouth issued three more "retain" certificates to petitioner, designated and showing a face amount as follows: Certificate
Face
No.
Designation
Amount
143
Packing House Operations
$ 6,340.58
155
Cannery Operations
11,840.03
262
Fertilizer Plant Operations
2,031.64
Total
$20,212.25
Each of the packing house, cannery, and fertilizer plant certificates was similar to Certificate of Equity No. 199 in Growers' Surplus, issued on December 15, 1947 for the 1946-1947 cannery operations. It provides in part: "Plymouth, Florida, December 15th, 1947. "This certifies that Mrs. M. G. Howey, Grower-member, has an equitable interest in the GROWERS' RESERVE of this Association, amounting to Seventy six hundred three & 03/100 Dollars. This equitable interest has been determined by the difference between the estimated cost of CANNERY OPERATIONS and the sum ascertained to be the actual cost of operations for the season 1946-1947, and is carried as a GROWERS' RESERVE to provide funds for owning and operating the Cannery. "The Directors may apply any excess in Growers' Reserve to the retirement of these Certificates of Equity in the *237 order issued, when, in their judgment, such excess exists. "THIS CERTIFICATE is transferable with the written consent of the Directors. "GIVEN under our hands and the seal of this Association this 15th day of December, A.D. 1947." Plymouth Citrus Growers Association was not required by law, members crop agreement, its articles of incorporation or by its bylaws to issue Certificates of Equity in Growers' Surplus for amounts retained by it as a reserve. As of May 5, 1953, petitioner had not received payment from Plymouth of the amounts represented by the "retain" certificates issued to her in 1947 and 1948. She has never demanded their payment nor requested permission to transfer them to others. As of May 5, 1953, Plymouth had not paid any "retain" certificates issued since the 1942-1943 season nor had it set aside or earmarked any funds for the redemption of such certificates. As of December 31, 1948, "retain" certificates issued by Plymouth in the following amounts were outstanding: Season
for which issued
Fruit
Cannery
Fertilizer
Total
33-34
$ 328.59
$ 53.03
$ 381.62
34-35
66.35
80.82
147.17
35-36
532.05
182.26
714.31
36-37
687.65
961.96
1,649.61
37-38
844.37
454.35
1,298.72
38-39
1,343.00
451.48
1,794.48
39-40
876.22
538.05
1,414.27
40-41
3,973.09
988.20
4,961.29
41-42
13,685.00
10,814.50
5,706.10
30,205.60
42-43
104,180.86
38,858.13
20,426.79
163,465.78
43-44
163,862.71
190,167.13
13,910.21
367,940.05
44-45
88,322.15
155,917.54
54,058.80
298,298.49
45-46
77,266.53
68,036.90
51,154.19
196,457.62
46-47
70,551.15
99,768.22
48,311.06
218,630.43
47-48
69,007.38
122,033.30
29,478.97
220,519.65
Totals
$595,527.10
$685,595.72
$226,756.27
$1,507,879.09
*238 Plymouth did not redeem the "retain" certificates issued in 1947 and 1948 because Plymouth was restricted by its loan agreement with the Columbia Bank for Cooperatives from paying any "retain" certificates without the bank's permission and there was no surplus cash available for their redemption. Two banks in Orlando, Florida will not accept Plymouth "retain" certificates as collateral. Plymouth will not accept a "retain" certificate from its members in payment for fertilizer or grove caretaking services. Petitioner resigned as a member of Plymouth Citrus Growers Association in 1948 and is no longer a member. On her income tax returns for the taxable years 1947 and 1948 petitioner disclosed as income the amounts remitted to her in cash by Plymouth from the proceeds of sale of her fruit. She also reported as income on her 1948 return certain amounts which she received in that year from Plymouth on account of the redemption of "retain" certificates issued in earlier years. She did not disclose any amount as income in either 1947 or 1948 on account of the receipt of "retain" certificates from Plymouth in those years. In the notice of deficiency respondent increased petitioner's *239 taxable income for 1947 and 1948 by the amount of the "retain" certificates issued to her by Plymouth in those years. The notice of deficiency was mailed to petitioner on January 11, 1952, more than 3 years but less than 5 years after March 15, 1948, the date on which petitioner's 1947 income tax return was filed. Petitioner's 1947 income tax return disclosed the following: Directors fee
$ 51.00
Dividends
1,930.50
Interest
4,068.56
Net gain from sale of capital assets
4,492.28
Net proft from farming: Sale of citrus fruit
$147,086.91
Agricultural program payments
2,878.04
149,964.95
Less: Labor hired
27,571.89
Supplies
99.11
Repairs and maintenance
4,375.73
Spray and dust
16,460.43
Fertilizer and lime
42,511.95
Gasoline and fuel
6,525.33
Taxes
7,755.67
Insurance
1,238.69
Utilities
226.64
Auto upkeep
1,289.77
Legal and accounting
1,525.00
Miscellaneous
527.47
Small tools
109.39
Tires, tubes and batteries
535.51
Depreciation
22,682.70
133,435.28
16,529.67
Net taxable income
$27,072.01
The item deducted as "labor hired" represents the expenditure by petitioner for labor employed to cultivate, *240 fertilize and spray her citrus groves and to harvest the fruit crop produced thereon. The items deducted as "spray and dust" and "fertilizer and lime" represent expenditures by petitioner for spraying materials and fertilizer applied to her citrus groves. In Florida citrus groves must be fertilized and sprayed annually in order to produce fruit on a commercially profitable basis. As a general practice fertilizer is applied two or three times a year. The type and amount of fertilizer applied affects the quantity of fruit produced. Citrus groves are sometimes sprayed in order to improve the quality of fruit. The six certificates issued to petitioner in 1947 and 1948 by Plymouth did not have at the time of their issuance a fair market value capable of being ascertained with reasonable certainty. Opinion Respondent once again attempts to tax "retain" or revolving fund certificates, issued by a tax-exempt cooperative to one of its partrons, at their face amount regardless of their fair market value. But as we said in B. A. Carpenter, 20 T.C. 603, on appeal (C.A. 5): "* * * The import of the decisions is that the member is not taxable unless the certificates have fair *241 market value." Nevertheless, the agency, reinvestment and constructive receipt theories are separately advanced. The facts demonstrate that Plymouth was no mere agent. In accordance with the power granted them by the Articles of Incorporation [1] and the Florida statutes under which the cooperative was created [2]the Board of Directors set up a reserve fund. The issuance of "retain" certificates, redeemable and transferable only at the discretion of the directors, [3] gave petitioner no real dominion or control over these funds. B. A. Carpenter, supra.See William A. Joplin, Jr., 17 T.C. 1526; P. Phillips, 17 T.C. 1027, on appeal (C.A. 5). But on the contrary the power of the directors to retain the funds whether or not they chose to issue the certificates, see P. Phillips, supra, cannot be doubted. This solitary attempted distinction from the Carpenter case is accordingly untenable. [4]
*242 As to the fair market value of the certificates, we think sufficient evidence has been introduced to overcome respondent's determination. They were non-interest bearing and not payable at any designated date. See Regulations 111, sec. 29.22(a)-4. They were transferable only with the written consent of the directors, who were following a policy of sharply limiting such transfers. No certificates issued after 1943 have ever been redeemed, even in part, and at the end of 1948 more than one and one-half million dollars worth of these certificates, some extending back as far as 1933 and 1934, were outstanding. The agreement with the Bank for Cooperatives required that the certificates be subordinated to the bank's loan. These facts would all seem to indicate that any purchase of the certificates in the years in question would have been a highly speculative venture. We have accordingly found as a fact that the certificates had no ascertainable fair market value at the time of their issuance. See Helvering v. Tex-Penn Oil Co., 300 U.S. 481; B. A. Carpenter, supra; Harold H. Kuchman, 18 T.C. 154, acq. 1952-2 C.B. 2; Edward J. Hudson, 11 T.C. 1042, 1050, *243 affd. (C.A. 5) 183 Fed. (2d) 180. In view of the disposition of the substantive issue we find it unnecessary to discuss the statute of limitations. Decision will be entered for the petitioner. Footnotes
1. Article 3 provides that "any surplus * * * shall be used as the Board of Directors of this Association shall deem to the best interest of the Association." ↩
2. Sees. 618.07, 618. 15 F.S. 1949↩. 3. The certificates say, for example: "The Directors may apply any excess in Growers' Reserve to the retirement of these Certificates of Equity in the order issued, when, in their judgment, such excess exists." (Italics supplied) ↩
4. On the theory of the case advanced by respondent we need not consider the "retain" certificates representing caretaking expense as in any respect different from those resulting from the marketing of the crop. Cf. P. Phillips, supra.Respondent states: * * * There is no claim or indication that Mrs. Howey advanced cash to Plymouth for such grove caretaking, hence it must be found that the actual expenditures were made from withheld marketing proceeds. * * * It is therefore submitted that this amount, like the rest of the retain certificates herein, represents additional income from marketing, hitherto unreported, which should now be added to her taxable income.↩